J. SHELTON BOLLING AND JANE BOLLING, ET AL., PETITIONERS,[1] *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket Nos. 89505–89508.   Filed January 16, 1962.

---

[1] The following proceedings are consolidated herewith: Carlos B. Bolling and Flaudean Bolling, Docket No. 89506; Cecil W. Bolling and Loretta Bolling, Docket No. 89507; and G. C. Branham and Flora Branham, Docket No. 89508.

*John Y. Merrell, Esq.*, and *K. William O'Connor, Esq.*, for the petitioners.

*Charles C. Shaw, Jr., Esq.*, for the respondent.

MULRONEY, *Judge:* The respondent determined deficiencies in the petitioners' income taxes as follows:

| Docket No. | Petitioner | Year | Deficiency |
|---|---|---|---|
| 89505 | J. Shelton Bolling and Jane Bolling | 1956 | $1,599.98 |
| | | 1957 | 6,203.99 |
| 89506 | Carlos B. Bolling and Flaudean Bolling | 1956 | 1,690.94 |
| | | 1957 | 5,688.25 |
| 89507 | Cecil W. Bolling and Loretta Bolling | 1956 | 801.91 |
| | | 1957 | 5,684.17 |
| 89508 | G. C. Branham and Flora Branham | 1956 | 816.89 |
| | | 1957 | 5,952.20 |

The issue in these consolidated cases is whether J. Shelton Bolling, Carlos B. Bolling, Cecil W. Bolling, and G. C. Branham, operating as the Bolling Coal Company, a partnership, possessed an economic interest in the coal which they owned under a leased agreement in 1956 and 1957 so as to be entitled to deductions for percentage depletion.

FINDINGS OF FACT.

Some of the facts were stipulated and they are herein included by this reference.

J. Shelton Bolling and Jane Bolling, husband and wife, are residents of Pound, Virginia; Carlos B. Bolling and Flaudean Bolling, husband and wife, are residents of Pound, Virginia; Cecil W. Bolling and Loretta Bolling, husband and wife, are residents of Pound, Virginia; and G. C. Branham and Flora Branham, husband and wife, are residents of Pound, Virginia. Petitioners filed their respective joint income tax returns for the years 1956 and 1957 with the district director of internal revenue at Richmond, Virginia. Hereinafter J. Shelton Bolling, Carlos Bolling, Cecil W. Bolling, and G. C. Branham will sometimes be called the petitioners.

On April 11, 1956, Emory Moore, D. R. Holloway, J. Shelton Bolling, Cecil W. Bolling, and Carlos B. Bolling formed a partnership under the name of Bolling Coal Company, hereinafter sometimes called the partnership, to engage in the mining of coal in southwest Virginia. On April 18, 1956, the partnership purchased a Caterpillar bulldozer and a Loraine shovel. Emory Moore and D. R. Holloway remained as partners in the partnership until July 13, 1956, when G. C. Branham and Cecil purchased their respective shares. During the

remainder of the year 1956 and the year 1957 the partnership was composed of J. Shelton, Cecil, Carlos, and G. C. Branham.

Clinchfield Coal Corporation (hereinafter sometimes called Clinchfield), a corporation organized under the laws of Virginia, was owner of certain mineral rights in the Clintwood seam of coal located in Dickenson County, Virginia, which was remote from Clinchfield's large coal-mining operation. There was limited tonnage in this area—the coal in the Clintwood seam was in a main seam (varying in thickness from about 42 inches to more than 60 inches) and several smaller seams, and it was more economical to mine these several seams by the strip-mining process. This process involves stripping off the earth (called the overburden) which lies over the coal, then removing the uncovered coal.

On June 1, 1956, Clinchfield, as lessor, and the Bolling brothers, together with one Everett Smith, as lessees, executed an agreement which provided, in part, as follows:

THIS LEASE AGREEMENT and MINING CONTRACT* made this 1st day of June, 1956, by and between CLINCHFIELD COAL CORPORATION, a corporation organized and existing under the laws of the State of Virginia, a party of the first part, hereinafter called the Lessor, and EVERETT B. SMITH, CECIL W. BOLLING, J. SHELTON BOLLING, and CARLOS B. BOLLING, Pound, Virginia, party of the second part, hereinafter called the Lessee, whether one or more.

### WITNESSETH

That for and in consideration of One Dollar, cash in hand paid by the Lessee to the Lessor, the receipt of which is hereby acknowledged, and in further consideration of the rents and royalties to be paid by the Lessee to the Lessor as hereinafter stipulated, and of the mutual agreements, provisions, stipulations and covenants hereinafter set out, the Lessor does hereby let, lease and demise unto the Lessee for strip mining purposes the Clintwood seam of coal on a portion of Lessor's David W. Meade 112.58 acre mineral tract, James Mooney 36.19 acre mineral tract and the R. L. Fleming 46.68 acre mineral tract, lying and being in Dickenson County, Virginia, on the waters of Keel Branch of Cranes Nest River; the area and boundary which is to be stripped to be determined by Lessor.

In mining said coal, the Lessor expressly limits the rights, easements and privileges hereby granted to the Lessee to the rights, privileges and easements owned by the Lessor, and which are set out and described in the deed or deeds under which the Lessor acquired title to the minerals on said tract of land: however, no timber is to be cut on the boundary or any other lands of Lessor, it being understood that mining under this agreement will be done by stripping, and that Lessee will obtain at his own expense such surface rights as are necessary to strip said coal, and that Lessor will not be liable as to third parties for any claims for damages of any nature resulting from or caused by the removal of the coal.

This lease and contract is subject to cancellation by either of the parties hereto upon the giving of thirty (30) days written notice, by the one to the other, of the party's intention so to do.

*The underlined portions were inserted in the standard form.

Upon expiration or cancellation of this lease, the Lessee, if not then in default in payment of royalties, or in the performance of any other covenants or obligations hereof, shall have sixty (60) days within which to remove from the premises all of the equipment, but not the structure, which the Lessee may have placed thereon or therein in the course of its operations hereunder, but if the Lessee is in default at the time of such expiration, then the Lessee shall have no right to remove any of such equipment from these premises, and in such event, it is expressly covenanted and agreed that the Lessor shall have, and is hereby given, a paramount lien on all the improvements, equipment and property, real, personal and mixed, owned by the Lessee, and used in, about, upon or in connection with the coal mining operations of the Lessee upon the leased premises to secure the payment of all royalties and other sums of money which may be due to the Lessor under the provisions of this agreement.

The Lessee hereby covenants and binds itself to pay to the Lessor a tonnage royalty of 27 cents per net ton of two thousand (2,000) pounds for each and every ton of coal mined and removed from the leased premises.

The Lessee hereby covenants and binds itself to pay to the Lessor a monthly minimum rental of $50.00, commencing July 1, 1956, so long as this agreement is in effect, whether or not enough coal is mined and removed to amount to said monthly minimum rental at the above tonnage rates. * * *

The Lessee hereby gives and grants to the Lessor and its assigns the right and option to purchase from the Lessee all the coal which the Lessee shall mine from the boundary developed under the lease, and agrees to deliver such coal to a point or points for loading as designated by Lessor from time to time, at a price or prices to be agreed upon between the Lessor and the Lessee.

The lessees also agreed to (1) furnish monthly statements to lessor of the amount of coal produced and removed from the mine; (2) keep certain production and sales records; (3) submit all mining and development plans to lessor; (4) permit lessor at all reasonable times to survey, measure, inspect, and examine the mine workings; (5) observe certain legal mining requirements imposed by the State and Federal governments; (6) protect the mined property with the necessary timbering; (7) furnish its own explosives, tools, and equipment, and to supply its own work force; (8) pay all taxes assessed upon property of every kind on the leased premises, as well as certain other taxes; (9) prosecute mining operations on the leased premises to maintain a daily production of about 200 tons of coal meeting lessor's quality standards; (10) exercise certain precautions in the mining operations; and (11) maintain certain insurance coverage. The agreement also provided as follows:

Lessee is, and shall be deemed to be, an independent operator, and solely liable for damages on account of injuries to persons or property arising in performance of this contract and agrees that Lessee will indemnify and save Lessor harmless from and against liability, loss or damage to property, or injury to or death of any person or persons, arising from or growing out of the work or operation under this contract, except such as may arise out of the sole negligence of Lessor.

Everett Smith was made a party to the lease agreement because he owned surface rights to some of the land covered by the agreement.

Prior to the execution of the lease agreement, the partnership had acquired these surface rights from Smith and had agreed to pay him a royalty of 30 cents per ton for all coal mined on the property covered by such surface rights. It was necessary for the partnership to obtain these and subsequent surface rights in order to conduct its strip-mining operation.

The partnership actually started to strip mine the coal in the Clintwood seam about 2 weeks before the lease agreement and mining contract was executed. Throughout the partnership's strip-mining operations in this area a representative from Clinchfield visited the job-sites regularly. When the three tracts specified in the lease agreement and mining contract were strip mined by the partnership, it continued to strip mine other tracts in this vicinity in which Clinchfield held mineral rights, since the seam of coal continued into the other tracts. The partnership acquired additional surface rights as its strip mining progressed to the other tracts, and the partnership obtained authorization from Clinchfield to continue its strip mining into the other tracts. Clinchfield owned the surface rights on some of the property strip mined by the partnership during this period, for which the partnership was not required to make any payments. The tracts included in the lease agreement and mining contract constituted about one-third of the property strip mined by the partnership in this area. The partnership's stripping operations in the Keel Branch area were concluded sometime in early 1958.

In its return of income for 1956 the partnership claimed a deduction of $22,148.61 for royalties paid to Emory Moore and Everett Smith for surface damages, $550 as surface damage payments to others, and $400 for "Wheelage." In its return of income for 1957 the partnership claimed a deduction of $18,653.65 for royalties paid to Everett Smith for surface damages, $13,625 for surface damage payments made to others, and $1,454.63 for "Wheelage."

About the middle of October 1957 the partnership acquired mining rights on property owned in Dickenson County, Virginia, by Willie E. Bryant and Golda Bryant for the amount of $12,500, and the partnership also acquired a tract of land in Dickenson County, Virginia, owned by Earl D. Owens and Geraldine Owens for the amount of $3,600. The partnership did not strip any coal on these two tracts before the end of 1957.

During the years 1956 and 1957 Clinchfield exercised its option to purchase all of the coal mined by the partnership, which delivered the coal to Clinchfield's processing plants where it was mixed with coal from other sources and processed before it was sold by Clinchfield.

Clinchfield paid the following per ton rates to the partnership for coal delivered to the Clinchfield processing plants:

| Period | Processing Plants | | |
|---|---|---|---|
| | Moss No. 1 Tippie | Lick Dock | Pound Dock |
| June 1956 to Oct. 1956 | $3.82 | $3.72 | |
| Oct. 1956 to Apr. 1957 | 3.97 | | |
| Apr. 1957 to Nov. 1957 | 4.03 | 3.93 | |
| Nov. 1957 to Jan. 1958 | 3.93 | | $4.13 |

The two principal items considered by Clinchfield in fixing the rates it paid for coal were (1) its own production costs and (2) the distance the coal had to be transported to the Clinchfield processing plants. It was Clinchfield's policy to keep the price it paid for the coal under its own production costs. In fixing these rates Clinchfield did not take into consideration its own sales price for coal. During 1956 and 1957 Clinchfield sold various grades of coal to its customers at various rates per ton. The weighted averages of the price of all coal sold by Clinchfield to its customers were as follows:

| Month | Weighted average | | Month | Weighted average | |
|---|---|---|---|---|---|
| | 1956 | 1957 | | 1956 | 1957 |
| January | | $5.901 | July | $5.715 | $6.182 |
| February | | 5.933 | August | 5.689 | 6.187 |
| March | | 6.044 | September | 5.654 | 6.114 |
| April | | 6.116 | October | 6.025 | 6.06 |
| May | | 6.068 | November | 5.992 | 5.90 |
| June | $5.660 | 6.041 | December | 6.020 | 5.81 |

During the period from June 1, 1956, to December 31, 1957, the partnership purchased on installment payment plans seven pieces of equipment for a total cost of $194,984.20. The equipment, as well as the bulldozer and shovel purchased earlier, were movable and could be used elsewhere in strip-mining operations. A used shovel purchased in 1956 and a used tractor and drill were depreciated by the partnership on a straight line method with estimated lives of 3 years, and the rest of the equipment was depreciated on a declining-balance method with estimated useful lives of 4 years.

At the end of the years 1956 and 1957 the partnership's assets were as follows:

| | 1956 | | 1957 | |
|---|---|---|---|---|
| Cash | | $9,073.47 | | $13,847.73 |
| Notes and accounts receivable | | 21,373.23 | | 18,373.90 |
| Advances | | | | 306.00 |
| Depreciable assets | $146,724.41 | | $280,380.35 | |
| Less: Accumulated depreciation | 42,722.63 | 104,001.78 | 114,215.79 | 166,164.56 |
| Goodwill | | 1,208.60 | | 1,208.60 |
| Prepaid expenses | | 6,194.07 | | 24,991.66 |
| Total assets | | 141,851.15 | | 224,892.45 |

Except for an item of office equipment which cost $47.50, all of the partnership's depreciable assets consisted of mining equipment.

The partnership received gross receipts from Clinchfield during the years 1956 and 1957 in the respective amounts of $275,105.62 and $641,091.86, and during the years 1956 and 1957 the partnership paid royalties to Clinchfield in the respective amounts of $17,686.91 and $40,022.07. During the years 1956 and 1957 the partnership had net profits, without considering any allowance for depreciation, in the respective amounts of $47,267.42 and $142,482.23.

On its returns of income for the years 1956 and 1957 the partnership claimed a percentage depletion deduction in the amounts of $22,204.62 and $60,105.17, respectively. Respondent disallowed both of these deductions with the explanation that "the partnership is not entitled to the depletion deduction claimed." The disallowance of these deductions increased the distributive share of income for the several partners in the years 1956 and 1957.

### OPINION.

The sole issue is whether the petitioners, operating as a partnership, are entitled to deductions for percentage depletion in their coal strip-mining activities in 1956 and 1957. Section 611(a)[2] provides that "In the case of mines, oil and gas wells, other natural deposits, and timber, there shall be allowed as a deduction in computing taxable income a reasonable allowance for depletion and for depreciation of improvements, according to the peculiar conditions in each case," and subsection (b) provides that "In the case of a lease, the deduction under this section shall be equitably apportioned between the lessor and lessee." Section 613, which deals with percentage depletion, provides that "the allowance for depletion under section 611 shall be the percentage, specified in subsection (b), of the gross income from the property excluding from such gross income an amount equal to any rents or royalties paid or incurred by the taxpayer in respect of the property," and that "Such allowance shall not exceed 50 percent of the taxpayer's taxable income from the property (computed without allowance for depletion)." Section 613(b)(4) provides that, in the case of coal, the percentage depletion rate is 10 percent.

In *Commissioner* v. *Southwest Exploration Co.*, 350 U.S. 308, the Supreme Court stated that the depletion deduction is "based on the theory that the extraction of minerals gradually exhausts the capital investment in the mineral deposit" and that the deduction is "designed to permit a recoupment of the owner's capital investment in the minerals so that when the minerals are exhausted, the owner's capital is unimpaired." In *Palmer* v. *Bender*, 287 U.S. 551, the Supreme Court,

---

[2] All section references are to the Internal Revenue Code of 1954, as amended.

in defining the interests in mineral deposits which would be entitled to a deduction for depletion under the predecessors of sections 611 and 613, stated that "the language of the statute is broad enough to provide, at least, for every case in which the taxpayer has acquired, by investment, any interest in the oil in place, and secures, by any form of legal relationship, income derived from the extraction of the oil, to which he must look for a return of his capital." The Court then added that the right to the deduction is not "dependent upon the particular legal form of the taxpayer's interest in the property to be depleted * * * [and that] it is enough, if * * * he has retained a right to share in the oil produced. If so, he has an *economic interest* in the oil, in place, which is depleted by production." (Emphasis added.) In *Helvering* v. *Bankline Oil Co.*, 303 U.S. 362, the Supreme Court further refined the term "economic interest" by stating that it was "not to be taken as embracing a mere economic advantage derived from production, through a contractual relation to the owner, by one who has no capital investment in the mineral deposit."

Here the petitioners were strip mining coal under a "LEASE AGREEMENT and MINING CONTRACT" with Clinchfield Coal Corporation, which owned the mineral and mineral rights on the tracts involved. The contract was cancelable by either party to the contract upon 30 days' written notice. To conduct this operation the petitioners were obliged to acquire surface rights, since strip mining is accomplished by stripping off the surface of the earth (overburden) which lies over the coal and then removing the uncovered coal. The partnership also incurred expenses for property damage, wheelage, and a road about a mile in length, which connected the site of operations with the highway. From June 1956, when the agreement was signed, to the end of 1957, the petitioners purchased equipment necessary for their strip mining amounting to about $195,000, and just prior to June 1956 they had purchased a bulldozer and a Loraine shovel at a cost of about $85,000. All of this equipment was movable and it was usable elsewhere. The partnership's balance sheet at the end of 1957 shows depreciable assets of $280,380.35, less a depreciation reserve of $114,215.-79, or a net amount of $166,164.56, and except for a minor item of office equipment, all of the depreciable assets consisted of mining property. Clinchfield had the right to purchase, and actually did purchase, all the marketable coal strip mined by petitioners during this period at a price which bore no relationship to Clinchfield's sales price.

We believe that the fact situations in two recent cases, in both of which coal strip miners under contract were denied a depletion deduction, are closely analogous to the facts of this case and therefore controlling here. In *Parsons* v. *Smith*, 359 U.S. 215, the taxpayers reached an agreement with Rockhill Coal Co. (Rockhill), which

owned certain coal-bearing property, to strip mine coal from such sites and seams as were designated by Rockhill. Taxpayers agreed to furnish all of the equipment, facilities, and labor necessary to strip mine and deliver the coal to Rockhill's cars at a fixed point. Their investment in equipment used in the work reached a high of $250,000; the equipment was movable and there was no evidence that it was not usable elsewhere or for other purposes. Rockhill agreed to pay taxpayers a stated amount for each ton of coal mined and delivered, and the parties contemplated that this amount per ton would be raised in the event of an increase in the union labor wage scale. Such amount was, in fact, raised on several occasions to cover higher costs for both labor and material used in the work. Taxpayers were not authorized to keep or sell any of the coal but were required to deliver all that was mined to Rockhill. The agreement was not for a definite term, nor did it obligate the taxpayers to mine the tract to exhaustion but, to the contrary, either party could terminate the agreement upon the giving of a 10-day notice.

Taxpayers argued that by their contracts to mine the coal, and particularly by contributing their equipment, organization, and skill to the mining project as required by these contracts, they in legal effect made a capital investment in, and thereby acquired an economic interest in, the coal in place, which was depletable by production, and that they were therefore entitled to the depletion deduction. The Supreme Court, in rejecting the taxpayers' contention said:

We take a different view. It stands admitted that before and apart from their contracts, petitioners had no investment or interest in the coal in place. Their asserted right to the deduction rests entirely upon their contracts. * * *

By their contracts, which were completely terminable without cause on short notice, petitioners simply agreed to provide the equipment and do the work required to strip mine coal from designated lands of the landowners and to deliver the coal to the latter at stated points, and in full consideration for performance of that undertaking the landowners were to pay to petitioners a fixed sum per ton. Surely those agreements do not show or suggest that petitioners actually made any capital investment in the coal in place, or that the landowners were to or actually did in any way surrender to petitioners any part of their capital interest in the coal in place. * * *

In *United States* v. *Stallard,* 273 F. 2d 847, the taxpayers entered into contracts with Clinchfield Coal Corporation,[3] owner of the coal underlying two tracts of land near Dante, Virginia, known as Justice Fork and Lick Fork, to strip mine areas designated by Clinchfield, truck the coal to an agreed point, and load it into mine cars provided by Clinchfield, subject to survey and examination of the mine workings by Clinchfield at all reasonable times. Taxpayers provided the necessary equipment and labor. All of the coal mined was to be

[3] This is the same corporation which was a party to the contracts in the present case.

delivered to Clinchfield and none of it was to be otherwise delivered and sold. Clinchfield was to pay taxpayers $3.22 per ton on a clean coal basis, which was arrived at by reducing the raw coal tonnage by 10 percent to cover the estimated tipple rejects so that the price to be paid to taxpayers amounted to $2.90 per net ton of raw coal loaded into the mine car. The mining contract was subject to cancellation by either of the parties upon the giving of 30 days' written notice. The record showed that the taxpayers, in order to do the work, were obliged to grade the area for laying the track for the coal cars, build access roads and ramps, and erect some buildings and a powerhouse at a cost of between $20,000 and $25,000. Taxpayers owned about $70,000 worth of equipment suitable for stripping operations and in order to perform the contract work, were obliged to acquire additional heavy equipment at a cost of $300,000. The record showed that this equipment was suited for strip-mining operations and that all that was usable was removed upon completion of the operation.

The Fourth Circuit in the *Stallard* case, in discussing the various factors which the courts have considered in deciding whether a taxpayer possesses an economic interest or merely an economic advantage, said:

A number of circumstances under the varying facts of the decided cases have been considered important factors in concluding on which side of the line the transaction falls. Perhaps the most important is whether the producer has the right under the contract to exhaust the deposit to completion or is subject in this respect to the will of the owner through a provision in the agreement empowering the owner to terminate the contract at will. If the operator has the absolute and exclusive right under the contract to exhaust the deposit, it is usually held that he has an economic interest in the mineral which entitles him to a depletion allowance, but if the owner has the right under the contract to terminate the relationship at will, the operator is deemed to be an employee of the owner or an independent contractor compensated at a specified rate with no right to the deduction.

Other circumstances which have been considered relevant in deciding the question include the substantial investment usually made by the producer to procure the needed equipment and means of access to the work, which are often of little or no value when the work is done; and also the right to dispose of the coal after it is mined—whether it is to be sold by the miner or the landowner, and whether the producer's return is fixed by the terms of the contract or is dependent upon the state of the market.

The Fourth Circuit, in holding against the taxpayers, found no material differences between the recent decision of the Supreme Court in *Parsons* v. *Smith, supra,* and the case before it, and pointed out that in both cases "the claim to a deduction rested upon the contract between the taxpayer and the owner under which the taxpayer agreed to furnish the equipment and mine and deliver the coal to the owner at a fixed price per ton; and the right of the taxpayers to carry on

the operation was completely subject to the will of the owner by reason of the right of the owner to cancel the contract at any time without cause on short notice."

Here, also, the petitioners engaged in their strip-mining operation under the contract completely subject to the will of Clinchfield, which had the right at any time to cancel the contract without cause upon the giving of 30 days' written notice. The language in the cancellation clause is unambiguous, and there is no merit in petitioners' arguments seeking to distinguish the cancellation clause in this case from that involved in the *Parsons* and *Stallard* cases. Merely by way of emphasis, we point out the testimony of an officer of Clinchfield, who took part in drafting the contract involved here, that the 30-day clause "gave us the flexibility that we needed in controlling such operations," and "If either of the parties, either Clinchfield, or the contract miner, became dissatisfied with the agreement we had reached, either could quit within 30 days and they could quit without cause."

Moreover, the 30-day cancellation clause is inconsistent with the petitioners' argument that they obtained a leasehold interest in the coal in place under their contract with Clinchfield. We have examined the contract with care and do not find anything in it which gives petitioners anything more than a right to strip mine certain tracts of land, on which Clinchfield owned the mineral rights, with the understanding that the extra area and boundary to be stripped was to be determined by Clinchfield as the operations progressed.

Petitioners also argue that their acquisition of surface rights and their acquisition of access rights and construction of roads to the coal deposits gave them rights that were essential to the production of the coal and that under the rationale of *Commissioner* v. *Southwest Exploration Co.*, *supra*, the petitioners qualify for a depletion allowance. We do not believe that the facts here are at all analogous to those in the *Southwest Exploration Co.* case, where the Supreme Court held that certain upland owners, whose land was essential under State law in order to slant-drill for offshore oil and was leased to oil operators for this purpose in return for a share of the net profits from the extraction and sale of oil, were entitled to take a depletion allowance on their income. In the *Stallard* case, the taxpayers, in order to carry on their strip mining, were obliged to grade the area for laying the track for coal cars, build access roads and ramps, and erect some buildings and a powerhouse, yet they were denied a depletion allowance. Similarly, we regard the acquisition of surface rights, wheelage, surface damage payments, and certain access rights by the petitioners in this case as expense items necessary to a successful strip-mining operation, but in no way can these expenses, which were currently

deducted in full by the petitioners, be regarded as giving them a capital investment in the coal in place.[4]

The one fact which might be said to lend some support to petitioners' position is that the lease agreement and mining contract contained no clause binding Clinchfield to take and pay for all of the coal mined by the partnership. It gave Clinchfield an option to take the coal at a mutually agreed-to price and the record shows Clinchfield did take and pay for all of the coal at an agreed-to price. However, insofar as the contract provisions are concerned it would not be exactly correct to say, as was said in *Parsons* and *Stallard* that petitioners agreed to look only to the landowners for payment. Presumably Clinchfield could refuse to exercise its option or there could be failure to mutually agree as to price and there seems to be no provision forbidding sales of mined coal to third parties.

But there is other evidence with respect to this portion of the contract. Cecil W. Bolling who negotiated the contract for the partnership testified it was his understanding that Clinchfield would take all of the coal at a price in line with what Clinchfield was paying other strippers in the area. It appears that Clinchfield had the only processing plant in the area and almost no coal was ever sold before processing. Under the circumstances we feel the absence of a binding contract compelling petitioners to look only to Clinchfield's payments for compensation is not sufficient basis to say petitioners gained an economic interest in the coal.

In deciding whether a particular taxpayer has acquired an economic interest in the mineral in place or merely an economic advantage, the courts, as we have indicated above, have considered it relevant whether the taxpayer looks for his compensation to the extraction and sale of the mineral or whether his compensation is dependent upon the personal covenant of those with whom he has contracted. *Parsons* v. *Smith, supra*; see *United States* v. *Stallard, supra*. Here the petitioners were to be paid a fixed sum by Clinchfield, subject to adjustment, for each ton of coal mined and delivered to Clinchfield. Under the contract the petitioners granted Clinchfield an option to purchase all the coal mined and delivered to designated points by petitioners "at a price or prices to be agreed upon." We have listed in our Findings of Fact both the prices paid by Clinchfield to petitioners over the period here involved and the weighted averages of all coal sold by Clinchfield to its customers during this time, and we are satisfied that the price per ton paid to petitioners was not geared to Clinchfield's sales price. There is testimony by an officer of Clinchfield that "in arriving at that price to pay the contractor the sales price of coal

---

[4] There is some indication in the District Court opinion in *Stallard* (170 F. Supp. 267) that the strip miners were to acquire the use of surface rights.

was not one of the items we considered, it was our own production cost and the distance he had to haul this coal, that received most of our attention." Petitioners point to several adjustments during this period in the price per ton, which adjustments occurred at the same time as changes in Clinchfield's sales price, as evidence of the inter-relationship between the two. However, the adjustments in the price per ton paid to petitioners were explained by an officer of Clinchfield as follows:

A. Well, I know that the price changed on October 1, 1956, as a result of a new contract with U.M.W.A., which increased labor costs. The same thing applied to the change on April 1, 1957, which in both cases was increases.

The change which was made in November 1957 was brought about generally by depressed conditions in the coal industry and lack of sufficient market to handle the entire volume we were handling. Therefore, we cut back on the quantity and also our cost of coal.

We hold that petitioners did not acquire an economic interest in the coal in place and, consequently, they are not entitled to a depletion deduction in the years here involved.

*Decisions will be entered under Rule 50.*