WINTERS COAL COMPANY, INCORPORATED, PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 1176–69.   Filed November 17, 1971.

*John Y. Merrell*, for the petitioner.
*Robert D. Hoffman*, for the respondent.

IRWIN, *Judge:* Respondent determined the following deficiencies in petitioner's income tax:

| Taxable year ended | Deficiency |
| --- | --- |
| March 31, 1965 | $32, 601. 27 |
| March 31, 1966 | 9, 307.95 |

After concessions made by respondent, the sole issue for determination is whether petitioner had an economic interest in the coal in place which it mined under a lease from the Alabama By-Products Corp. which would have entitled it to a deduction for percentage depletion under sections 611 and 613 of the Internal Revenue Code of 1954.[1]

_____
[1] All statutory references are to the Internal Revenue Code of 1954, as amended, unless otherwise indicated.

FINDINGS OF FACT

Some of the facts have been stipulated. The stipulation and the exhibits attached thereto are incorporated herein by this reference.

Petitioner is the Winters Coal Co., Inc., an Alabama corporation whose principal place of business is Birmingham, Ala. Petitioner was a cash basis taxpayer and for the taxable years ended March 31, 1965 and 1966, it filed its income tax returns with the district director of internal revenue, Birmingham, Ala.

Petitioner was formed in 1964 to engage in a coal-mining business which had been operated previously as sole proprietorship by P. L. Winters (Winters). From time to time Winters has entered into various leases and contracts in his own name. The parties have agreed that for the purposes of this case Winters shall be deemed to have assigned to petitioner all such leases and contracts entered into prior to petitioner's incorporation and to have acted for and on behalf of petitioner in the case of all such leases and contracts entered into thereafter.

On December 1, 1959, Winters entered into a lease of coal lands from Alabama By-Products Corp. (ABC) which covered lands owned in fee by ABC as well as lands in which ABC held only a mineral interest. The following are the pertinent provisions of this lease:

Now THEREFORE, the Lessor for the considerations and subject to the terms and conditions hereinafter set out has demised and let and by these presents does demise and let to the said Lessee, for the purpose of mining and removing therefrom by the Stripping method only the coal from the Black Creek seam therein, the following described lands or interests in land, to-wit:

Fee Simple Interest:

S½ of SE¼ of SW¼, Section 12,

Township 15 South, Range 2 West,

Jefferson County, Alabama.

Mineral Interest:

NE¼ of NW¼ of Section 13,

Township 15 South, Range 2 West,

Jefferson County, Alabama.

To HAVE AND To HOLD unto the said Lessee for the term hereof as hereinafter set out, subject to the following conditions and limitations:

1. Mining rights granted. * * *

\*        \*        \*        \*        \*        \*        \*

In the event the Lessor is the owner of the minerals and mining rights only on the above described lands the rights herein granted shall be limited to such as the Lessor has in connection with the mining of said coal, and this lease shall not be effective unless and until an appropriate lease or release, acceptable to Lessor has been obtained from the surface owner by the Lessee and furnished to Lessor. In the event of any dispute as to the ownership of or rights in any surface lands leased hereunder, or as to the ownership of or extent of the mineral and mining rights in any lands leased hereunder, the Lessee shall dis-

continue the use of said surface or of said mineral, either or both, as the case may be, until such dispute shall have been settled.

2. Royalty. * * * The Lessee shall, as rental for the said lands or interests in land to be mined by the stripping method, pay the Lessor not later than the 10th day of each month fifty cents ($0.50) per ton of two thousand (2000) pounds for all coal mined therefrom during the preceding month, subject to a minimum monthly royalty of Fifty Dollars ($50.00) per month beginning with the first full month after the execution of this lease; provided that as to said lands or interests in land to be mined by the stripping method where the Lessor is the owner of the minerals and mining rights only the amount per ton of two thousand (2000) pounds to be paid for all coal mined therefrom during the preceding month shall be forty cents ($0.40). Weights shall be determined in the manner from time to time mutually agreed upon between the parties, and in the event of any dispute as to weights, the same shall be submitted to arbitration as provided for herein.

If the mining of the coal hereunder is prevented for any full calendar month during the terms of this lease by any strike or work stoppage of miners which is general in the district in which the leased lands are located, the minimum monthly royalty provided herein shall be suspended for that month.

> *   *   *   *   *   *   *

5. Lessee Independent Contractor. Lessor shall have no control or right to exercise any control whatsoever over Lessee, Lessee's employees, sub-lessees or assigns in their operations under this lease. The right to engineering inspection under this lease, the right to inspect Lessee's records and the right to consent to removal of pillars herein reserved by Lessor shall not give, or be deemed to give Lessor the right to exercise, and Lessor shall not have the right or be permitted to exercise, any control over Lessee or Lessee's employees, sub-lessees or assigns or advise or assist Lessee or Lessee's employees, sub-lessees or assigns in its mining operations hereunder.

6. Indemnity. The Lessor shall not be liable for any claims for damages which may arise from the exercise by Lessee of the rights herein granted or in any way growing out of said mining operations by Lessee, whether under the Workmen's Compensation Act of Alabama or otherwise, and Lessee agrees to and does hereby indemnify, protect and hold harmless the Lessor against any and all claims, demands, suits, judgments and decrees instituted by any third party, arising from the exercise by Lessee of the rights herein granted or at any time or in any way growing out of said mining operations by Lessee.

7. Payment of taxes.

a. Taxes to be paid by Lessor. Lessor shall in accordance with law return for ad valorem taxation the interest which it owns in the lands leased by it hereunder including the unmined coal contained therein, and shall at such times as required by law pay all taxes or charges in the nature of ad valorem or ownership taxes thereon, excepting the so-called tonnage, license or privilege tax levied upon the severance, removal or mining of the coal therefrom.

b. Taxes to be paid by Lessee. Lessee shall in accordance with law return for taxation all structures, machinery, equipment and other property placed by it in, under and upon said lands, and shall at such times as may be required by law pay all taxes or charges in the nature of taxes thereon. Lessee shall also pay said so-called tonnage, license or privilege tax upon the severance, removal or mining of the said coal, and all income, social security, old age and unemployment taxes which are, or during the life of this lease may be imposed on them

or their employees, and any other taxes which may be required by law with respect to the mining of coal therefrom or the sale thereof.

8. Termination.

a. Mutual right. Either party shall have the right to terminate this lease at any time upon sixty (60) days' notice in writing to the other party by U.S. registered mail to its last known address.

b. Breach of Lessee. If the Lessee shall make any default in connection with this agreement or shall violate or breach any of the terms, covenants or agreements herein contained (except as to the payment of royalty) and such default, violation or breach shall continue for a period of thirty (30) days after written notice thereof by the Lessor to the Lessee shall have been mailed by U.S. registered mail to Lessee's last known address, then the Lessor shall have the right at any time after said thirty (30) days to terminate this lease and all rights of the Lessee hereunder shall thereupon cease and determine.

c. Default in payment. If the Lessee shall make any default in the payment of royalty to the Lessor under this lease, and such default shall continue for a period of ten (10) days after written notice thereof shall have been given by the Lessor to the Lessee by U. S. registered mail to Lessee's last known address, then the Lessor shall have the right at any time after said ten (10) days to terminate this lease and all rights of the Lessee hereunder shall thereupon cease and determine.

d. Failure to terminate. Any failure by the Lessor to terminate this lease because of any breach by the Lessee of any of the terms, conditions or limitations of the lease, or for any other grounds for termination provided for in this lease shall not constitute a waiver on the part of the Lessor of the right to terminate this lease because of any other or future breach of the said terms, conditions or limitations by the Lessee, or for any other or future grounds for termination, whether or not of a like or similar kind.

\*        \*        \*        \*        \*        \*        \*

14. Term of lease. Unless otherwise terminated as provided for herein, this lease shall be for a period of one year from the date first hereinabove written and, unless notice in writing to the contrary is given by either party to the other on or before thirty (30) days prior to the expiration date or any anniversary thereof, shall continue thereafter from year to year subject however to termination by either party upon thirty (30) days' written notice to the other.

15. Lessee recognizes and enters into this lease with the understanding and upon the condition that Lessor may during the initial period of this lease or any extension thereof require for its own purposes the coal hereby leased to Lessee, that one of the purposes of the mutual rights to terminate this lease set forth in Paragraphs 8. a. and 14. hereof is to enable Lessor to terminate this lease in the event Lessor in its sole opinion does require such coal for its own purposes, that Lessor is willing to enter into this lease only upon the reservation of the aforesaid rights to terminate the lease, and that Lessor may terminate this lease in accordance with said rights (for said reason or for any other reason) or in accordance with any other right to terminate the same. The foregoing does not necessarily preclude the possibility that instead of terminating this lease in the event of requiring the coal for its own purposes Lessor might not undertake to negotiate the purchase, upon mutually agreeable terms and conditions, from Lessee the coal mined under this lease by Lessee, but Lessor makes no commitment so to do and it is specifically understood that such negotiations are not to be and shall not be a condition precedent to the exercise by Lessor of any right or rights to terminate this lease.

From time to time thereafter petitioner and ABC amended their lease of December 1, 1959, to include additional mining properties owned by ABC. In these cases ABC's lease of the mineral rights to Winters was subject to the following proviso:

It is understood that we make no representation or warranty whatsoever that there is any coal in the above described lands, that any coal therein is mineable or merchantable, that any coal therein, if mineable or merchantable, would be suitable for our use, or that we shall purchase any coal mined from said lands.

On August 31, 1964, Winters entered into a new lease agreement with ABC. This new lease embodied substantially the same provisions as the lease of December 1, 1959, except that different lands were involved, the amount of the royalty was slightly different, the termination period (par. 8. a.) was reduced from 60 to 30 days, and paragraph 15 was omitted.

At all relevant times petitioner sold coal to ABC under a contract which Winters had entered into on February 27, 1958, the pertinent provisions of which are the following:

WITNESSETH:

That the Seller agrees to sell to the Buyer and the Buyer agrees to buy from the Seller its requirements of coal as hereinafter set out, upon the terms, conditions and convenants hereinafter set forth:

1. Quantity: Approximately 100 tons each day that Buyer's Bradford washer operates during the term hereof.

2. Grade: BLACK CREEK COKING COAL of uniformly good coking quality acceptable to Buyer, to be produced from strip mines at such locations available to Seller as may from time to time be approved by Buyer as acceptable sources of said coal; * * *

*     *     *     *     *     *     *

5. Right to Reject: Buyer shall have the right to reject at any time prior to washing, whether before or after dumping, any and all coal delivered hereunder by Seller which in Buyer's opinion is not of good coking quality, or contains excessive rock, clay or other impurities, or contains rash or is oxydized.

6. Price: Buyer shall pay Seller $5.50 per net ton of two thousand (2000) pounds for the coal sold and delivered hereunder, as follows: "Net ton" shall mean run-of-mine coal less pro rata adjustment for impurities. * * *

The sale price under the agreement of $5.50 per ton was changed periodically by mutual agreement of the parties. With few exceptions, petitioner sold all of the coal that it mined from the properties leased from ABC to ABC under the purchase contract.

During the years at issue, all of the coal mined by petitioner under the leases from ABC was so situated as to be suitable for mining and removal by the strip-mining method only and could not be mined by underground-mining methods. The strip-mining method requires the complete removal and displacement of the surface of the land con-

taining the coal deposit. Accordingly, the holder of the mineral rights in land cannot remove the coal therefrom by the strip-mining method unless he acquires either a fee simple in the land or the right to conduct strip-mining (surface rights) from the owner of the fee simple.

All of the coal mined under the leases from ABC during the years in issue was situated on land in which ABC held the mineral rights only. Consequently, and in accordance with its leases with ABC, petitioner was required to purchase either the fee simple or the surface rights in the land which it mined. At various times, petitioner paid a total of $35,400 for this purpose.

OPINION

Petitioner mined coal for the taxable years at issue by the strip-mining method from land which it leased from ABC. Generally, petitioner's lease with ABC provided that petitioner would pay the greater of a stated price per ton of coal extracted or a minimum amount as a royalty to ABC for its coal, that petitioner would be an independent contractor, and that either ABC or petitioner could terminate the lease upon 30 days' written notice and without cause. A condition precedent to petitioner's right to mine under the lease was that it acquire the fee simple or surface rights in all land in which ABC owned only the mineral rights. In all cases during the years at issue, petitioner was required to purchase the fee simple or the surface rights in the land in which the mineral deposits leased from ABC were situated. The lease from ABC did not set forth any conditions for disposal of the coal after it was mined by petitioner; however, petitioner was obligated by an agreement entered into several years earlier by Winters to sell to ABC its requirements of coking coal. Petitioner did in fact sell nearly all of the coal that it mined from deposits leased from ABC to ABC under this agreement.

Petitioner claims that it is entitled to the deduction for depletion provided by section 611(a) as made available to lessees of mineral rights under section 611(b)(1). Section 613 sets the deduction for depletion in the case of coal mines at 10 percent of a taxpayer's gross income from mining not to exceed 50 percent of taxable income from mining. Section 611(a) delegates specific authority for regulations to be issued setting forth the circumstances in which the deduction for depletion is available, and section 1.611-1(b)(1), Income Tax Regs., was promulgated to this end. In pertinent part it states:

(b) *Economic interest.* (1) Annual depletion deductions are allowed only to the owner of an economic interest in mineral deposits or standing timber. An economic interest is possessed in every case in which the taxpayer has acquired by investment any interest in mineral in place or standing timber and secures, by any form of legal relationship, income derived from the extraction of the

mineral or severance of the timber, to which he must look for a return of his capital. But a person who has no capital investment in the mineral deposit or standing timber does not possess an economic interest merely because through a contractual relation he possesses a mere economic or pecuniary advantage derived from production. * * *

The regulation articulates the economic interest test first set forth by the Supreme Court in *Palmer* v. *Bender*, 287 U.S. 551 (1933), which has been followed in innumerable cases. Petitioner claims that under the circumstances of this case it had the requisite economic interest in the coal that it mined under the leases from ABC. We disagree.

Petitioner's lease with ABC and the other circumstances in its case appear hardly distinguishable from the situation present in *J. Shelton Bolling*, 37 T.C. 754 (1962), in which we held that the lessee under a coal lease did not have an economic interest in the coal in place that would entitle him to the deduction for depletion. Similarly, our findings and decision with respect to the "Bolling" lease in *Charles F. Mullins*, 48 T.C. 571, 582–583 (1967), appear to preclude our holding for petitioner in this case. In both *J. Shelton Bolling, supra*, and *Charles F. Mullins, supra*, the fact that lessor had the right to terminate the lease at will was held to be inconsistent with the taxpayer's claim that it had an economic interest in the coal in place. In *Mullins* we noted the following which appears applicable to petitioner:

there is little doubt that in order to have a property right the contract lessee must have an interest which cannot be terminated at the will of the lessor or on short notice. This Court and the Court of Appeals for the Fourth Circuit have repeatedly held that the right to mine to exhaustion or for a specific period is the critical factor in determining whether a lessee has obtained a depletable economic interest in the mineral in place. * * * In our view a lessee cannot acquire by investment an interest in the coal in place when any interest he has in the coal is terminable by the lessor at will or on short notice, particularly where, as in this situation, the lessor in fact purchased most of the coal. Moreover, the petitioners, as lessee, also had a right of termination on 60 days' notice. * * * [48 T.C. at 583.]

Petitioner does not deny that ABC possessed the absolute right to terminate the coal lease at will or that ABC purchased substantially all of the coal mined from the leased properties. It claims that its ownership of the fee simple or the surface rights in the land upon which the leased mineral rights were located obviated the effect of ABC's right to terminate and its right to purchase its requirements for coal from the coal mined under the lease. This claim is based upon what we have previously found to be a misapplication of the Supreme Court's decision in *Commissioner* v. *Southwest Expl. Co.*, 350 U.S. 308 (1956). *J. Shelton Bolling, supra* at 764.

The facts in *Commissioner* v. *Southwest Expl. Co., supra*, are somewhat peculiar: The State of California desired to exploit offshore

oil reserves that it owned; however, State law at that time only permitted the oil to be reached by drilling from adjacent upland property. Accordingly, in seeking bids from oil drillers the State required that each bidder obtain the permission of adjacent upland owners to drill upon their land before submitting its bid. Southwest obtained the permission of three upland owners in consideration of its promise to pay them a royalty based upon a percentage of its profits from the extraction of oil. Subsequently, Southwest acquired an oil easement from the State. Upon these facts the Court held that the economic position of the upland owners was so dominant and that of Southwest so dependent upon their cooperation that the upland owners rather than Southwest had the requisite economic interest in the oil in place to entitle them to the deduction for depletion.

Petitioner contends that its position is analogous to that of the upland owners in *Commissioner* v. *Southwest Expl. Co.*, *supra*. Petitioner was required to purchase either the fee simple or surface rights in all the lands in which ABC's mineral interests were located. It argues that as long as it controlled the land in which ABC's coal was situated no one else could extract the coal and that, consequently, ABC's right to terminate its lease was illusory. Petitioner's argument fails to recognize that its economic position was hardly as strong as that enjoyed by the upland owners in *Southwest Expl. Co.* The upland owners not only could deny access to the oil to Southwest, but also they could deny it to others. "Without their participation there could have been no bid, no lease, no wells and no production." *Southwest Expl. Co.*, *supra*, at 315. The power inherent in petitioner's control of the coal fields was merely to prevent ABC from extracting the coal without its permission; petitioner could not extract the coal itself or permit others to mine without ABC's cooperation. Accordingly, petitioner did not have complete economic dominion over the mineral deposit as did the upland owners; at best, it shared such dominion with ABC.

As a matter of fact, petitioner's economic position was something less than equal to that of ABC. Petitioner purchased the fees simple and the surface rights only to satisfy conditions imposed by ABC; and petitioner was permitted to mine ABC's coal mainly to satisfy ABC's requirements for coal. Although petitioner had the technical right to sell its coal to other people, it sold substantially all of its coal to ABC. Petitioner's requirements contract with ABC effectively limited the number of customers for coal to one. Accordingly, little weight can be given the fact that petitioner may have been the legal owner of the coal after extraction. Similarly, all the conditions contained in the lease which purport to make petitioner an independent operator merely benefit ABC by reducing its exposure to State law matters like work-

men's compensation, property taxes, and public liability. While petitioner may have been legally independent from ABC, it was economically dominated by ABC. In light of ABC's effective control over the disposition of the coal and the fact that petitioner's substantial investment in obtaining the fees simple and surface rights would be valueless if the lease were terminated, its right to prevent ABC from using its coal was no more than an idle threat.

We concluded in *J. Shelton Bolling, supra* at 764, that the taxpayers' expenses to acquire surface rights and similar interests necessary to obtain the coal under their lease were merely deductible expenses of their coal-mining business. Petitioner has pointed out no fact existing in its situation which should cause us to depart from our analysis in *J. Shelton Bolling*, which is in every significant respect identical to this case. Accordingly, we hold that petitioner did not have an economic interest in the coal mined under the lease from ABC and that it is not entitled to a deduction for depletion for such coal.

*Decision will be entered under Rule 50.*