Walter Bernard McCALL and Marie S. McCall, Sam G. McCall and Ruth W. McCall, Petitioners,

v.

COMMISSIONER OF INTERNAL REVENUE, Respondent.

No. 8707.

United States Court of Appeals Fourth Circuit.

Argued Oct. 10, 1962.

Decided Jan. 7, 1963.

John Y. Merrell, Washington, D. C., for petitioners.

Thomas A. Skornia, Attorney, Department of Justice (Louis F. Oberdorfer,

Asst. Atty. Gen., and Lee A. Jackson and Robert N. Anderson, Attorneys, Department of Justice, on the brief), for respondent.

Before SOBELOFF, Chief Judge, BRYAN, Circuit Judge, and WINTER, District Judge.

WINTER, District Judge.

Two or three partners (Taxpayers), and their wives who joined with them in filing joint income tax returns, appeal from the Tax Court's determination (37 T.C. 674 (1962)) of deficiencies in income taxes for the year 1956, occasioned by the disallowance of a deduction for depletion, provided for by 26 U.S.C.A. § 611 and the regulations issued thereunder, in regard to coal mining carried on by the partners. The partnership claimed a depletion deduction for 1956 in the amount of $29,002.22. Disallowance had the effect of increasing each partner's gross income by $9,667.40, with an increase in tax due from Mr. and Mrs. Walter Bernard McCall of $2,773.68, and an increase in tax due from Mr. and Mrs. Sam B. McCall of $3,044.75. Based upon earlier tax litigation under the 1939 Internal Revenue Code which reached the opposite result, McCall v. Commissioner, 27 T.C. 133 (1956), we are asked to determine whether the doctrine of the collateral estoppel is applicable and, if not, the availability of the depletion deduction to Taxpayers for 1956.

Taxpayers were in 1956, together with their nephew, partners in Rebecca Coal Company (Rebecca) which by contact, dated May 1, 1950, with Norma Mining Company (Norma),[1] obligated themselves to mine and deliver coal from a portion of the leasehold interest in Tazewell County, Virginia, which Norma, by a twenty-year lease, dated November 1, 1949, acquired from Youngstown Mines Corporation (Youngstown), and which gave to Norma, upon payment of certain royalties, including a guaranteed minimum payment, the exclusive right to mine and remove coal from, in and upon the demised premises, itself or through independent contractors. Prior to execution of its contract with Rebecca, Norma subdivided the larger tract, removed rocks, constructed roads to eleven designated mine entrances and faced up the coal so that the operating contractors could install drift mine openings and build chutes for handling the coal.

Specifically, Rebecca's contract with Norma obligated Rebecca to (1) drive an entry into the seam at the designated place and to mine, by deep mining methods, all coal in that seam over a certain thickness; (2) mine the coal so as to produce the greatest quantity of lump coal possible and deliver it to the screening plant or tipple of Norma, unless otherwise directed by Norma; (3) conduct all mining operations in accord with the terms of the Youngstown lease, except as modified in the May 1, 1950 contract; (4) do all necessary work and provide all necessary materials, apparatus and labor for the mining operation; (5) produce a minimum of 50 tons of coal under normal conditions; (6) timber the mine and repair old timbering; (7) keep in repair the road and roadways from the mine to Norma's screening plant or tipple; (8) lay and construct all necessary mining tracks; (9) keep the mine drained and free from obstructions; (10) permit Norma to enter and inspect the premises; (11) comply with all mining and other applicable laws, both state and federal; and (12) carry Workmen's Compensation insurance and public liability insurance.

As consideration, Norma agreed to pay Rebecca $4.00 per short ton for all coal mined and delivered, subject to change by mutual agreement, from time to time, as the coal market fluctuated.

---

1. During the tax year in question the co-partners of Rebecca were Sam G. McCall, William Bernard McCall and George W. McCall, Jr. At the time of the contract with Norma, the co-partners were Sam G. McCall, George W. McCall, Jr. and Marvin C. Witt d/b/a M. & W. Coal Company. The designation "Rebecca" will be used to refer to the partnership in its various forms and under its various names.

The term of the contract was made co-extensive with the term of Norma's lease from Youngstown, with the further provision that "* * * *either party may terminate this Contract, without cause, after thirty (30) days notice, in writing, to the other party, of his or its intention so to do.*" (emphasis supplied.) Upon expiration or termination in accordance with the quoted language, Rebecca was given twenty days to remove certain movable equipment, but fixtures and underground timbering and supports became the property of Norma without obligation for compensation.

In addition to the right of either party to terminate, without cause, Norma had an immediate right to terminate for cause, to re-enter and regain possession of the premises and to exercise a possessory lien as to all movable equipment until Rebecca shall have paid all damages and claims arising out of the default on its part giving rise to Norma's exercise of the right of termination. Norma was also given the right, if by reason of economic conditions it was unable to sell the coal mined and delivered by Rebecca at a reasonable profit to Norma, upon twenty-four hours' notice, to require Rebecca to suspend mining. And Norma reserved the right to strip mine any coal which could not be properly mined, by Rebecca, by deep mining.

The assessment of deficiencies as a result of disallowance of a depletion deduction was grounded upon 26 U.S.C.A. § 611, reading, in part:

"§ 611. Allowance of deduction for depletion

"(a) *General rule.*—In the case of mines, oil and gas wells, other natural deposits, and timber, there shall be allowed as a deduction in computing taxable income a reasonable allowance for depletion and for depreciation of improvements, according to the peculiar conditions in each case; such reasonable allowance in all cases to be made under regulations prescribed by the Secretary or his delegate."

To the extent pertinent, Section 1.611-1 (b) (1) of the Regulations under the Internal Revenue Code of 1954, 1 Fed. Tax Reg. (1962 Ed.), § 1.611-1(b) (1), provides:

"Allowance of Deduction for Depletion

\*     \*     \*     \*     \*     \*

"(b) Economic interest. (1) annual depletion deductions are allowed only to the owner of an economic interest in mineral deposits or standing timber. An economic interest is possessed in every case in which the taxpayer has acquired by investment any interest in mineral in place or standing timber and secures, by any form of legal relationship, income derived from the extraction of the mineral or severance of the timber, to which he must look for a return of his capital. But a person who has no capital investment in the mineral deposit or standing timber does not possess an economic interest merely because through a contractual relation he possess a mere economic or pecuniary advantage derived from production. For example, an agreement between the owner of an economic interest and another entitling the latter to purchase or process the product upon production or entitling the latter to compensation for extraction or cutting does not convey a depletable economic interest \*     \*     \*."

At the outset, it should be noted that present 26 U.S.C.A. § 611 is substantially identical to Section 23(m) of the Internal Revenue Code of 1939, under which arose the prior litigation, McCall v. Commissioner, supra. That case concerned income taxes for 1952 for the same two Taxpayers and their wives. The agreements between Norma and Youngstown and between Norma and Rebecca were the same as in 1956, as were the other significant facts. It was held (27 T.C. 133, at p. 136) that "* * * under the terms of the contract [between Norma

and Rebecca], the partnership [Rebecca] acquired an economic interest in the coal and was entitled to recover its investment by way of a percentage depletion deduction * * *." Accordingly, the position of Taxpayers in that litigation was sustained and the tax deficiencies claimed by the Commissioner disallowed.

With principal emphasis on Commissioner v. Sunnen, 333 U.S. 591, 68 S.Ct. 715, 92 L.Ed. 898 (1948), Taxpayers urge that the 1956 McCall case collaterally estopped the Commissioner from relitigating the same issues for the tax year 1956 as had been litigated, and decided adversely to the Commissioner, for the tax year 1952. This is so, the Taxpayers argue, because in the intervening period (1) there had been no change in the controlling legal principles and (2) all essential facts were previously adjudicated and that adjudication is binding. Taxpayers also cite, inter alia, United States v. Munsingwear, Inc., 340 U.S. 36, 71 S.Ct. 104, 95 L.Ed. 36 (1950); Fairmont Aluminum Company v. Commissioner, 222 F.2d 622 (4 Cir., 1955); and Commissioner v. Arundel-Brooks Concrete Corp., 152 F.2d 225, 162 A.L.R. 1200 (4 Cir., 1945).

The Sunnen case was concerned with whether a taxpayer for 1937–1941 retained sufficient interest and control in regard to certain royalty contracts so that the payments thereunder to his wife should be taxed to him. For an earlier period, 1929–1931, the Board of Tax Appeals had held, with regard to the same facts, that there was a legally effective splitting of income, so that the Tax Court held by the principle of *res judicata* that a different result as to the later years was barred. The Court reversed, saying, with regard to *res judicata* and collateral estoppel in the field of taxes (333 U.S. pp. 598–599, 68 S.Ct. p. 719):

" * * * if a claim of liability or non-liability relating to a particular tax year is litigated, a judgment on the merits is *res judicata* as to any subsequent proceeding involving the same claim and the same tax year.

But if the later proceeding is concerned with a similar or unlike claim relating to a different tax year, the prior judgment acts as a collateral estoppel only as to those matters in the second proceeding which were actually presented and determined in the first suit. Collateral estoppel operates, in other words, to relieve the government and the taxpayer of 'redundant litigation of the identical question of the statute's application to the taxpayer's status.' Tait v. Western Md. R. Co., 289 U.S. 620, 624, [53 S.Ct. 706, 77 L.Ed. 1405]. "But collateral estoppel is a doctrine capable of being applied so as to avoid an undue disparity in the impact of income tax liability. A taxpayer may secure a judicial determination of a particular tax matter, a matter which may recur without substantial variation for some years thereafter. But a subsequent modification of the significant facts or a change or development in the controlling legal principles may make that determination obsolete or erroneous, at least for future purposes. If such a determination is then perpetuated each succeeding year as to the taxpayer involved in the original litigation, he is accorded a tax treatment different from that given to other taxpayers of the same class. As a result, there are inequalities in the administration of the revenue laws, discriminatory distinctions in tax liability, and a fertile basis for litigious confusion. Compare United States v. Stone & Downer Co., 274 U.S. 225, 235–236, [47 S.Ct. 616, 71 L.Ed. 1013]. Such consequences, however, are neither necessitated nor justified by the principle of collateral estoppel. That principle is designed to prevent repetitious lawsuits over matters which have once been decided and which have remained substantially static, factually and legally. It is not meant to create vested rights in decisions that have become obsolete or erroneous

with time, thereby causing inequities among taxpayers."

After cautioning that collateral estoppel applies only where controlling facts and applicable legal rules remain unchanged, the Court, elsewhere in the opinion, enumerated some of the instances where the doctrine of collateral estoppel is inapplicable (333 U.S. p. 600, 68 S.Ct. p. 720): "If the legal matters determined in the earlier case differ;" "where the situation is vitally altered between the time of the first judgment and the second;" "a judicial declaration intervening between the two proceedings may so change the legal atmosphere;" "a modification or growth in legal principles as enunciated in intervening decisions of this Court;" and "legal modulations by this Court."

As the law of this Circuit, pre- and post- Sunnen decisions, state no different rules of law, Fairmont Aluminum Company v. Commissioner, supra,[2] and Commissioner v. Arundel-Brooks Concrete Corp., supra.[3]

Since it is undisputed that there has been no significant change in facts since the 1956 case, we must determine if there has been a change in the law of the type which the Court in Sunnen said is sufficient to render the doctrine inapplicable. Concluding as we do that there has been a sufficient shift to lift the.bar of the 1956 adjudication, we necessarily examine the present state of the law and decide adversely to Taxpayers that they are entitled to the current depletion deduction.

The principal shift relied on by the Commissioner is the decision in Parsons v. Smith, 359 U.S. 215, 79 S.Ct. 656, 3 L. Ed.2d 747 (1959), which concerned the availability of the depletion deduction for strip mining of coal by a partnership, engaged chiefly in road building and another partnership, engaged chiefly in strip mining. Both taxpayers entered into agreements binding them to mine and deliver coal to the owners of the coal fields, for compensation at a stated price per ton of coal. Both taxpayers were required to furnish their own equipment to conduct the mining operation, some of which was usable for road building. In one case the agreement was terminable at will by either party on ten days' notice; in the other, by the owner on thirty days' written notice.

As to each taxpayer, the Court held the depletion deduction unavailable. After stating that the rationale of the depletion deduction was to permit an owner of a depletable resource to recapture his capital interest over the period of depletion, the Court stated that, except for apportionment when permitted by statute, only one person the owner or the person having a capital investment or an economic interest in the capital asset in place, was entitled to the deduction.[4] The taxpayers were held to have an economic advantage but not a capital investment or economic interest in the coal in place and, hence, the deduction was denied them. After pointing out that their "contracts * * * were completely terminable without cause on short notice * * *" (p. 224, 79 S.Ct. p. 662)

2. 222 F.2d 622, 625, holding collateral estoppel to be applicable, per Parker, C. J.:

"It is well settled that, although a judgment rendered with respect to taxes for one year is not res judicata in a suit for taxes for another year, a decision as to a matter put in issue and decided in the former suit is binding on the principle of estoppel by judgment or collateral estoppel with respect to the same matter arising in the subsequent litigation, provided that, in the meantime, there has been no change in the fact situation or in the law applicable thereto."

3. 152 F.2d 225, 227, holding collateral estoppel inapplicable, per Soper, J.:

" * * * the rule announced therein [Tait v. Western Md. R. Co., 289 U.S. 620, 53 S.Ct. 706, 77 L.Ed. 1405 (1933)] does not control if a relevant change in the law has taken place since the decision of the court which is relied on as binding between the parties in subsequent litigation; and that such a change may consist of an intervening decision of either a State or a Federal court."

4. During oral argument, it was stated that Norma has claimed and been afforded the depletion deduction in the case at bar.

the Court answered taxpayers' argument that their contractual right to mine coal and the use of their equipment, skills and organizations should be regarded as the making of a capital investment and the acquisition of an economic interest in the coal in place, by saying (p. 225, 79 S.Ct. p. 663):

" * * * the asserted fiction is opposed to the facts (1) that petitioners' investments were in their equipment, all of which was movable— not in the coal in place; (2) that their investments in equipment were recoverable through depreciation— not depletion; ( 3) that the contracts were completely terminable without cause on short notice; (4) that the landowners did not agree to surrender and did not actually surrender to petitioners any capital interest in the coal in place; (5) that the coal at all times, even after it was mined, belonged entirely to the landowners, and that petitioners could not sell or keep any of it but were required to deliver all that they mined to the landowners; (6) that petitioners were not to have any part of the proceeds of the sale of the coal, but, on the contrary, they were to be paid a fixed sum for each ton mined and delivered, which was, as stated in Huss, agreed to be in 'full compensation for the full performance of all work and for the furnishing of all [labor] and equipment required for the work'; and (7) that petitioners, thus, agreed to look only to the landowners for all sums to become due them under their contracts. The agreement of the landowners to pay a fixed sum per ton for

mining and delivering the coal 'was a personal covenant and did not purport to grant [petitioners] an interest in the [coal in place].' Helvering v. O'Donnell, 303 U.S. 370, 372 [58 S.Ct. 619, 82 L.Ed. 903]."

We deem the Parsons case controlling of the case at bar if the case at bar be treated as arising for the first time. Indeed, following the Parsons case, this Court decided United States v. Stallard, 273 F.2d 847 (4 Cir., 1959), which applied the Parsons case to deny the depletion deduction in a strip mining case having facts substantially like those in the case at bar. The decision in Stallard unquestionably rested upon the provision in the contract between the parties which gave each the unqualified right to cancel upon thirty days' written notice, notwithstanding that the parties offered testimony to show that they intended the contract to continue for an indefinite period except for an act of default on the part of the operator conducting the mining operations or a change in market conditions which would make the operation an unprofitable one.[5]

■■■■ The only conceivable reason why, if the case at bar be treated as arising for the first time, Parsons and Stallard would not control is the difference between strip mining and deep mining and the differences in degree between capital investment necessary to carry on each and the ability of an operator, under a contract terminable without cause on short notice, to recapture, physically, or by depreciation, certain of the installations necessary to conduct deep mining operations. To this there are several answers. First, as the Stallard case demonstrates, we do not consider the

5. 273 F.2d 847, 849:
"The termination clause of the contract, as we shall see, has a most important bearing upon the central question in the case * * *."
273 F.2d 847, 853:
"We find no material difference between the circumstances of the Parsons case and those of the case at bar. In both, the claim to a deduction rested upon the contract between the taxpayer

and the owner under which the taxpayer agreed to furnish the equipment and mine and deliver the coal to the owner at a fixed price per ton; *and the right of the taxpayers to carry on the operation was completely subject to the will of the owner by reason of the right of the owner to cancel the contract at any time without cause on short notice.* * * *" (emphasis supplied)

actual extent of expenditure by the operator as the determining factor as to whether the operator has obtained a capital investment or economic interest, as distinguished from an economic advantage. Where the contract is terminable at will, at least by the owner or long-term lessee, that feature is the determining feature. Second, of all types of deep mining, the method employed here required the smallest capital expenditure of any.[6] Third, Rebecca has treated, apparently without objection by the Commissioner, its "capital expenditures" as expense items, so that Rebecca obtains an immediate tax deduction in the year of expenditure and is not relegated to slow restoration by depreciation deductions. Manifestly, the differences do not serve to differentiate the rules of law which should apply to the two types of mining.

Prior to the Parsons decision, supra, the principal Supreme Court cases on the depletion deduction were Burton-Sutton Oil Co. v. Commissioner, 328 U.S. 25, 66 S.Ct. 861, 90 L.Ed. 1062 (1946), and Commissioner v. Southwest Exploration Co., 350 U.S. 308, 76 S.Ct. 395, 100 L.Ed. 347 (1956).[7] In the Burton-Sutton case, in upholding the claim of an oil producer to a depletion deduction, the Court said (328 U.S. pp. 34-35, 66 S.Ct. p. 867): "Depletion depends only upon production. It is the lessor's, lessee's or transferee's 'possibility of profit' from the use of his rights over production, 'dependent solely upon the extraction and sale of the oil,' which marks an economic interest in the oil." Thus, the Court apparently stressed the "possibility of profit" as the determining factor in deciding whether a taxpayer had an economic interest in a wasting asset. The Southwest-Exploration Co. case, although restating the two factors required to be shown to entitle a taxpayer to the depletion deduction (350 U.S. p. 314, 76 S.Ct. p. 398): " * * * that a taxpayer is entitled to depletion where he has: (1) 'acquired, by investment, any interest in the oil in place,' and (2) secured by legal relationship 'income derived from the extraction of the oil, to which he must look for a return of his capital,' "cited Burton-Sutton with approval as a case where both factors were present and, hence, where the taxpayer had an "economic interest."

The decisions of this Court prior to the Parsons and Stallard cases also demonstrate a lack of emphasis on the terminability of the producer's interest as a crucial test in deciding whether he had an economic interest in a wasting asset and, hence, was entitled to the depletion deduction. Commissioner v. Gregory Run Coal Co., 212 F.2d 52 (4 Cir., 1954), cert. den. 348 U.S. 828, 75 S.Ct. 47, 99 L.Ed. 653 (1954), held a producer entitled to the depletion deduction, on the theory that he had a possibility of profit in exercising his rights under the contract and, hence, obtained an economic interest in the wasting asset.[8]

In Weirton Ice & Coal Supply Co. v. Commissioner, 231 F.2d 531 (4 Cir., 1956), a producer was held entitled to a depletion deduction, again on the theory of the Burton-Sutton case, notwithstanding that the contract between the owner and the producer provided that it might be terminated by either without cause upon ninety days' written notice. Significantly, except for the summary statement of this provision of the contract,

---

6. Mineral Facts and Problems (1960 Ed.), Bull. 585, Bureau of Mines, pp. 117-118.

7. These cases were extensions of the test of "economic interest" in the mineral in place, first announced in Palmer v. Bender, 287 U.S. 551, 557-558, 53 S.Ct. 225, 77 L.Ed. 489 (1933).

8. After quoting extensively from Burton-Sutton Oil Co. v. Commissioner, supra, the Court said (212 F.2d p. 61):

"In both cases [Burton-Sutton and the case at bar] the depletion was dependent upon production and in both the possibility of profit from the use by the operator of his rights over production was dependent solely upon the extraction and sale of the product and gave him an economic interest therein."

706

the opinion nowhere discussed the importance of this provision in determining whether the taxpayer claiming the deduction had an economic interest in the wasting asset. Commissioner v. Hamill Coal Corp., 239 F.2d 347 (4 Cir., 1956), involved a strip mining contract where the taxpayer, who was the producer, and the owner, each had the unqualified right to terminate their agreement at any time upon ninety days' written notice. Aside from the statement of this provision of the contract, the right of termination was not otherwise discussed in an opinion which sustained the taxpayer's right to a portion of the depletion deduction, on the theory that it had obtained an economic interest in the coal.

It was not until Stilwell v. United States, 250 F.2d 736 (4 Cir., 1957), that terminability of the taxpayer's right was recognized as "[A] most important factor (p. 739)," in the determination of whether the taxpayer had an economic interest. But in the Stilwell case, it was found that the parties intended the contract to continue for an indefinite period as long as it was satisfactorily performed by the producer, so that at best the recognition of terminability was dictum because unnecessary to the decision.

With this review, there can be little question but that the Parsons decision, supra, and the Stallard decision, supra, constituted a marked shift in emphasis, if not in basic law, by the Supreme Court and this Court, respectively, of the circumstances where a depletion deduction could be lawfully claimed. That the earlier Tax Court decision, McCall v. Commissioner, 27 T.C. 133 (1956), as compared to the one appealed here, 37 T.C. 67 (1962), represented a similar shift is equally clear. In the earlier case, the formal findings of fact include mention of the thirty day cancellation clause, but the opinion may be read in vain to find any discussion of the significance of this fact.[9] In the latter, squarely in reliance on Parsons v. Smith, supra, the terminable nature of Rebecca's interest was held decisive.

*Res judicata* is inapplicable here; the tax years in question are different.[10] Collateral estoppel likewise does not apply; the earlier case failed to consider the effect of the thirty day cancellation clause, the effect of which was decisive in view of the change in basic law, as expressed in the Parsons and Stallard cases, supra. Even if we were to doubt (which we do not), the extent of the impact of those cases, they represent at least a sufficient change or development in controlling legal principles so that the important consideration of equality of tax treatment requires that application of the doctrine of collateral estoppel be rejected and the earlier Tax Court decision be abandoned.

The decision of the Tax Court is

Affirmed.

9. To the contrary, the opinion rested on a different basis, 27 T.C. 133, 136:
"Among the most important criteria in determining whether an independent contractor possesses a true economic interest or only an economic advantage in the coal which he mines are whether or not he has an exclusive right to mine all of the coal within a given area and whether he must look to a sale thereof for his profit—the price which he receives being dependent upon the market price of the coal when sold."

10. N.L.R.B. v. Norma Mining Corp., 206 F.2d 38 (4 Cir., 1953), cited by Taxpayer, concerned the control exercised by Norma over employees of certain operators other than Rebecca, a question arising under the National Labor Relations Act. Rebecca was not a party so that this decision could not be *res judicata* of anything as to Rebecca. Nor do we think it serves as a basis for collateral estoppel as to a person not a party to the litigation.