LLOYD WEAVER, PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 1437–76.     Filed June 28, 1979.

---

*Victor Chini,* for the petitioner.
*Louis J. Zeller,* for the respondent.

HALL, *Judge:* Respondent determined deficiencies in petitioner's income tax of $2,686.15 for 1972 and $3,447.05 for 1973. Due to a concession by respondent, the issue remaining is whether petitioner had an economic interest in the Newson, Munroe, and Coe properties which entitled him to deductions for depletion under section 611(a).[1]

### FINDINGS OF FACT

Some of the facts have been stipulated and are found accordingly.

At the time he filed his petition, Lloyd Weaver was a resident of Hastings, N.Y.

During the years in issue, petitioner was self-employed, doing business as the Lloyd Weaver Construction Co. His business included the extraction and sale of sand, gravel, and stone. These materials were extracted from petitioner's property or, pursuant to agreements, from property owned by others. In this case we are concerned with three such agreements: the Newson, the Munroe, and the Coe agreements.

---

[1] All statutory references are to the Internal Revenue Code of 1954, as in effect during the years in issue.

## *The Newson Agreement*

On July 15, 1969, petitioner entered into a written agreement with Albert and Grace Newson[2] which gave petitioner the

---

[2]The agreement between the parties was as follows:

"WHEREAS, the Parties of the First Part [Albert and Grace Newson] are owners of certain lands located in the Township of Scriba's Patent, County of Oswego and State of New York, and known as the Newson Farm; and,

"WHEREAS, the Party of the Second Part [Lloyd Weaver] has reason to believe that portions of said Newson Farm contain valuable gravel beds, and the Party of the Second Part desires to purchase and extract such gravel; and,

"WHEREAS, said lands are located in the Township of Scriba's Patent, County of Oswego and State of New York, containing approximately ninety-seven (97) acres of land, more or less, and known as Lots number 9 and 10 in the Township of Scriba's Patent, County of Oswego and State of New York, and bounded on the south by lands of C & Z Associates, on the west by New York State Route 11, on the east by lands of Barker and on the north by lands of Clarence George, and for a more particular description reference is hereby made to a deed of said property which is filed in the Office of the Clerk of the County of Oswego, also described in Schedule 'A' attached hereto and made a part hereof.

"Now, THEREFORE, in consideration of the mutual promises of the parties hereto, the Parties of the First Part do and hereby grant to the Party of the Second Part the exclusive option and right to extract and remove any and all gravel on subject premises upon the following terms and conditions:

"(1) That the Party of the Second Part shall have the exclusive right to open such sand, stone and gravel beds as may be situate on the subject premises and extract said mineral materials from such property at his own expense and account. This Agreement and right shall continue until such sand, stone and gravel deposits or other mineral deposits are exhausted or until such time as the Parties of the First Part shall give notice in writing of their intention to cancel said agreement. Notice to cancel said agreement will be given to the Party of the Second Part at least one hundred twenty (120) days prior to the cancellation date. If the Parties of the First Part decide to sell the premises in question during the tenure of this lease they may do so if they give the Party of the Second Part a thirty (30) day written option to meet any sales price quoted.

"(2) The Party of the Second Part shall have the right to enter upon said premises and make such test borings, samplings and surveys of the subject premises to determine quantity and quality of mineral deposits at his own cost and expense.

"(3) If the test samplings prove satisfactory to the Party of the Second Part as to quality and quantity of such sand, stone and gravel deposits available, then the Party of the Second Part will pay the Parties of the First Part Six Hundred Dollars ($600.00) as an advance payment for the future removal of said sand, stone and gravel deposits.

"(4) The Party of the Second Part agrees to pay as rent therefor, Fifteen Cents ($.15) for each cubic yard of sand, stone, gravel, mineral or earth extracted and removed from said premises. Payments will be made on Tuesday mornings for the materials extracted from the premises during the previous week. In the event that such payment is not forthcoming by Friday of the week in question, then the Parties of the First Part have the right to cancel this agreement without the written one hundred twenty (120) day notice as required in paragraph (1) herein. The Six Hundred Dollars ($600.00) advance will be paid in the following manner: One-third (1/3) of the sum due and payable for gravel extracted on each week will be subtracted from the amount owed the Parties of the First Part and credited against the Six Hundred Dollars ($600.00) advance. This procedure will continue until the Six Hundred Dollars ($600.00) advance has been paid in full.

"(4a) The Party of the Second Part further agrees that he will keep and maintain daily tally sheets estimating the amount of material extracted from the subject premises. These sheets will be used to substantiate the weekly payments made to the Parties of the First Part and the Parties of the First Part may, at their discretion, inspect these tally sheets.

"(5) It is further understood and agreed that the Party of the Second Part shall obtain and keep in effect the necessary public liability and Workmen's Compensation insurance policies to protect the Parties of the First Part.

"(6) It is further agreed and understood between the parties to this agreement that the Party of the Second Part shall not remove or excavate or dig within one hundred (100) feet from each side of

exclusive "option and right" to extract and remove sand, stone, and gravel from about 20 acres of property owned by the Newsons. As consideration, petitioner agreed to pay the Newsons "as rent" 15 cents per cubic yard of mineral extracted and removed from the premises. Upon test sampling proving satisfactory to petitioner, he was required to and did make an advance payment of $600 to be credited subsequently against one-third of "rents" owed weekly as the minerals were removed. He made no other initial payments for the right to extract minerals. There was no required minimum to be extracted. Petitioner was not required to sell the extracted materials to any particular party.

Petitioner's extraction rights were to continue until the materials were exhausted, subject to the Newsons' right to cancel with or without cause upon 120 days' notice. The notice period was sufficient under the circumstances to extract significant portions of the available mineral on the site after notice, had the Newsons given notice. It was provided, however, that if the Newsons decided to sell the property, petitioner had a 30–day option "to meet any sales price quoted." Petitioner, in fact, purchased this property for $20,000 on April 16, 1973. Petitioner was still mining the property in 1976.

Petitioner could not assign the agreement, except to obtain credit, without the Newsons' consent.

---

the house or from the front and rear of said house and at least twenty (20) feet from the barn as now situate on the subject premises; and further, that if the Party of the Second Part tests on the area described as the Maple Grove area, which is approximately five hundred (500) to six hundred (600) feet running along Route 11, at the front of the property, and also is approximately one hundred fifty (150) feet deep, does not show that at least twenty-five thousand (25,000) cubic yards of stone, gravel and sand can be removed, then the Party of the Second Part shall not remove any stone, gravel, sand or other minerals from said area, but shall leave it in its present condition; nor shall the Party of the Second Part in any way interfere with the free and unrestricted access and use of such buildings by the Parties of the First Part, or their assignees.

"(7) In the event that any of the payments required to be made by the Party of the Second Part are not made in accordance with the terms of this Agreement, then the Parties of the First Part may terminate this Agreement upon written notice without regard for the one hundred twenty (120) day termination clause.

"(8) This Agreement may not be assigned by the Party of the Second Part without the express written consent of the Parties of the First Part, and such consent will only be given if the Parties of the First Part are satisfied of the adequate financial responsibility of such assignee, except, however, the Party of the Second Part may assign to a lending person or institution for credit purposes.

"(9) This Agreement shall bind and inure to the benefit of the respective parties hereto, and their respective legal representatives, distributees, successors, heirs and assigns.

"This Lease shall be subject to being subordinated to any mortgage financing which may be hereinafter placed upon said property by the Parties of the First Part or their successors in title."

## The Munroe Agreement

On February 10, 1972, petitioner entered into a written agreement[3] which gave him the exclusive right to extract stone, sand, and gravel from property owned by Thomas H. Munroe, Sr. As consideration, petitioner agreed to pay Munroe 20 cents per cubic yard of materials extracted and removed. No advance, minimum, or other type payment was required. Petitioner was free to sell the material to any one he chose.

The agreement provided that gravel material removed from the Munroe site was to remain Munroe's property until petitioner delivered the material to a jobsite and paid Munroe the amount due. If the material were stockpiled before delivery upon property other than Munroe's, the stockpile was to be identified as Munroe's and the property owner was to be notified in writing that the material belonged to Munroe.

This contract was to remain in effect until April 1, 1975, unless extended by mutual written agreement of the parties. The contract was not subject to cancellation by either party, and no stated minimum extraction was required.

---

[3]The Munroe agreement provided as follows:

"1. Munroe is the owner of certain land located in the Town of Hastings, County of Oswego, State of New York, portions of which contain gravel beds, and Weaver desires to extract and purchase certain stone, sand, and gravel (herein called 'gravel material') from Munroe.

"2. Munroe hereby grants to Weaver the exclusive right to extract and remove such gravel material from the seven-acre parcel of Munroe's property described and outlined on the attached map. Munroe, however, retains the right to a roadway across said seven acres for purpose of access to and from the ten acres located beyond the seven acre parcel, as indicated on the attached map.

"3. Weaver shall pay Munroe Twenty Cents ($0.20) for each cubic yard of gravel material extracted and removed by him as measured by the four-yard bucket on loader and by the truckload and shall report to him weekly the amounts so extracted and removed.

"4. The gravel material removed from the site of the subject property shall remain the property of Munroe, and shall be so identified wherever stockpiled, until such gravel material is delivered by Weaver to a job site and Weaver has paid Munroe for such material. Weaver shall account to Munroe for gravel material delivered by him to a job site each week, and shall pay Munroe for such gravel material on a monthly basis. All other gravel material extracted and stockpiled, either on or off Munroe's property, shall be accounted for by Weaver and identified as Munroe's. If gravel material is stockpiled on the property of persons other than Weaver or Munroe, Weaver shall notify such other person in writing, with copy to Munroe, that such material belongs to Munroe.

"5. This agreement shall terminate on April 1, 1975, but may be extended by mutual written agreement between the parties. Any gravel material stockpiled at any location and identified as Munroe's at the end of the term of this agreement, or any extension thereof, shall be released to Munroe for disposition by him within a reasonable time as agreed by the parties.

"6. Weaver agrees to name Munroe as an additional assured by endorsement on the liability insurance policy maintained by Weaver for so long as Weaver and any persons employed by him are working on or otherwise using Munroe's premises in connection with such gravel operations. A copy of such insurance endorsement shall be delivered to Munroe by May 31, 1973."

## The Coe Agreement

Pursuant to a written contract,[4] Hadwen and Verna Coe agreed to sell petitioner gravel from their gravel bed, a 10-acre site, during the period November 1, 1971, to June 1, 1972, in exchange for 15 cents per cubic yard of material taken. If the Coes desired to continue to allow extraction from their land after termination of the contract, petitioner had the first option to mine the property. Petitioner was not restricted with regard to whom he sold the gravel. No minimum amount of extraction or minimum payment was required.

Petitioner's written agreement with the Coes expired on June 1, 1972. Petitioner believed that he had extracted all the salable mineral from the Coe property by June 1, 1972. However, after that date, he had an opportunity to sell very coarse gravel which still remained there and accordingly secured Coe's agreement and recommenced extraction activities, but did not mine a great deal after May 1972.

## Petitioner's Mining Procedure

Subsequent to the execution of each of these agreements, petitioner surveyed the land to delineate the exact location of the area with respect to which he had contracted, to insure that the roads were properly laid out, to insure that only the land under the contracts was cleared, and to avoid trespassing. The survey was not required to determine the existence of commercially marketable deposits, however, for petitioner knew such deposits existed when he signed each of the agreements. He then cleared the sites for operation, put in drainage, and built and maintained roads used to remove the materials. Each area mined was later reclaimed and refilled by petitioner, at a cost of about $1,000 per acre. Bulldozers and loaders owned by petitioner were used to clear and refill the land. During the years in issue,

---

[4]The Coe agreement provided as follows:

Gravel Contract

Between Hadwen & Verna Coe (Seller)

and

Lloyd Weaver Construction Co. (Buyer)

Beginning Nov. 1, 1971 and expiring June 1, 1972

\* \* \* \* \* \* \*

"Hadwen & Verna Coe agree to sell gravel from their bed at south east portion of their farm located on Co. Rt. #38, Hastings, N.Y. to Lloyd Weaver Construction Co.

"Lloyd Weaver Construction Co. agrees to pay to Hadwen and Verna Coe fifteen cents per yard ($.15) for all gravel material taken. All gravel material taken shall be paid for at the end of each week for material taken preceding week.

"Lloyd Weaver to have First option to Renew Contract."

petitioner took deductions for depreciation of this equipment and for salaries paid to the operators.

On March 25, 1972, petitioner paid the Newsons $100 for a right-of-way across their property. The right-of-way was needed to gain access to both the Coe and Munroe properties.

On his income tax returns for 1972 and 1973, petitioner claimed percentage depletion deductions of $9,868.02 and $11,855.77, respectively, on account of minerals extracted from his own gravel pits and the gravel pits leased from the Newsons, Munroe, and the Coes. Respondent in his statutory notice determined that petitioner was not entitled to depletion deductions for the minerals extracted from the Newson, Munroe, and Coe properties. Accordingly, respondent disallowed $8,825.97 of the claimed 1972 deduction and $7,312.22 of the claimed 1973 deduction.

## OPINION

Section 611(a) provides that "In the case of mines, oil and gas wells, other natural deposits, and timber, there shall be allowed as a deduction in computing taxable income a reasonable allowance for depletion." This deduction "is permitted in recognition of the fact that * * * mineral deposits are wasting assets and is intended as compensation to the owner for the part used up in production." *Helvering v. Bankline Oil Co.,* 303 U.S. 362, 366 (1938). The deduction for percentage depletion is allowed as long as the minerals are being extracted and sold regardless of cost incurred by the taxpayer. Sec. 613; *Burton-Sutton Oil Co. v. Commissioner,* 328 U.S. 25, 34 (1946). The deduction is not dependent upon the particular legal form of the taxpayer's interest in the property. *Anderson v. Helvering,* 310 U.S. 404 (1940). However, only individuals owning an economic interest in a depletable resource are entitled to the deduction for depletion. *Palmer v. Bender,* 287 U.S. 551, 557 (1933).

The test in determining whether a taxpayer possesses an economic interest is whether the taxpayer has (1) acquired by investment an interest in the mineral in place, and (2) whether he looks to the income from the extraction of the materials for a return of his investment. *Palmer v. Bender, supra* at 557. The investment must be such that it is necessarily reduced as the sand, stone, and gravel is extracted. See *Kirby Petroleum Co. v. Commissioner,* 326 U.S. 599 (1946). This test was adopted in

section 1.611–1(b)(1), Income Tax Regs., which in pertinent part provides:

(b) *Economic interest.* (1) Annual depletion deductions are allowed only to the owner of an economic interest in mineral deposits * * * . An economic interest is possessed in every case in which the taxpayer has acquired by investment any interest in mineral in place * * * and secures, by any form of legal relationship, income derived from the extraction of the mineral * * * to which he must look for a return of his capital. * * * A person who has no capital investment in the mineral deposit * * * does not possess an economic interest merely because through a contractual relation he possesses a mere economic or pecuniary advantage derived from production. * * *

The issue presented in this case is whether petitioner is entitled under section 611 to deductions for percentage depletion on sand, stone, and gravel extracted from the Newson, Munroe, and Coe properties during 1972 and 1973. More specifically, the issue is whether petitioner acquired, pursuant to the agreements with the Newsons, Munroe, and the Coes, an economic interest in the minerals in place. Petitioner contends that he had an economic interest in each of these properties entitling him to an allowance for depletion. On the other hand, respondent contends that the agreements merely granted petitioner an economic advantage, not an economic interest, and therefore petitioner is not entitled to a deduction for depletion.

In this case, petitioner met the second part of the two-prong economic interest test of *Palmer v. Bender.* He had made investments which would clearly be recoverable, if at all, only from the proceeds of his sale of minerals extracted from the mining properties in question. The investments so made included his having the property surveyed, clearing overburden, constructing roads, installing drainage, building access roads, acquiring a right-of-way, and incurring the obligation to recover the sites at a cost of about $1,000 per acre after completing his operations.

The real issue, then, is whether petitioner "acquired by investment an interest in minerals in place," thereby satisfying the first prong of *Palmer v. Bender.* If these words were read without reference to the substantial body of case law which has staked out their boundaries, it might well be contended that petitioner has made no such investment. In the case of the Munroe agreement, for example, petitioner literally made no direct "investment" at the time he initially acquired his rights as lessee to the minerals. He had no express obligation to do any

mining at all, and agreed to pay Munroe only if, as, and when he did extract minerals on his property. It is true that he incurred substantial development expenses, as detailed above, but these expenses gave him no greater *ownership* rights *in mineral in place;* they merely enlarged his economic stake in exercising his rights to mine under the lease. It would appear on the basis of a surface reading, therefore, that such investment fell short of acquisition by investment of an interest in minerals in place. Despite this literal reading, the case law, discussed below, convinces us that the acquisition by a mine operator of a substantial bona fide ownership or leasehold interest in the minerals in place, or the economic equivalent thereof, will satisfy the first prong test, whether or not an "investment" is made to *acquire* such interest, at least as long as a significant related investment is made in development of the property to facilitate exploitation of such ownership or leasehold rights. Thus, it has frequently been held to suffice that a capital interest is acquired, even if not literally acquired by *investment.* We conclude that the *investment* need not literally be an investment in the minerals in place; it suffices if the investment is a practical prerequisite to successful exploitation of rights to mine the mineral in place, so long as the taxpayer in fact acquires and owns a true capital interest in the mineral in place. Nor does it appear to disqualify the investment that it be recognizable taxwise other than through the depletion allowance. We reached this conclusion despite the fact that in *Parsons v. Smith,* 359 U.S. 215 (1959), the taxpayer's ability to recoup his investment through depreciation, rather than depletion, was listed as one of the seven factors militating against a holding that an economic interest was obtained. In *Parsons,* the taxpayer was a contract miner. He did not enjoy the benefits or risks of ownership of mineral either in place or after severance. He had no clear capital interest in the mineral. Under such circumstances, the fact that his investment in movable extraction equipment was depreciable for tax purposes was simply another good reason the taxpayer had no economic interest. We do not read the case as standing for the proposition that a qualifying investment may not be recoverable taxwise other than through the depletion allowance. Nor do we find other cases so holding.

An investment in minerals in place may be acquired by purchase for cash, in exchange for other property, for services rendered, by gift, by inheritance, or

as a liquidating dividend. An investment in minerals in place may be retained if it is represented by a portion of a previously-owned economic interest. It is not necessary that the taxpayer incur a cost in connection with the acquisition or retention of the investment, or that he have any tax basis in such investment. [F. Burke & R. Bowhay, 1979 Income Taxation of Natural Resources, Par. 2.10. Fn. ref. omitted.]

We do not, in fact, find, nor does respondent cite to us, any cases in which a taxpayer was held not to have satisfied the required "investment in mineral in place" if he indeed had a clear capital interest in such mineral—an interest as owner or lessee of such a nature that his capital interest necessarily diminished as the mineral was extracted, and would become zero at its exhaustion, and if he shared directly in the economic productivity of the minerals and market risk on their sale.

The taxpayers whose cases have presented difficulties in this area have had bundles of rights in the mineral in place falling short of those of the classic owner of a fee or leasehold. For example, in *Commissioner v. Southwest Exploration Co.*, 350 U.S. 308 (1956), the novel problem was presented of a taxpayer who had no interest as owner or lessee of offshore minerals, but who contributed to the venture the legally indispensable right to use his upland property as a platform for slant drilling. This was held to constitute an investment in minerals in place. In *Food Machinery & Chemical Corp. v. United States*, 172 Ct. Cl. 313, 348 F.2d 921 (1965), and, *Food Machinery & Chemical Corp. v. United States*, 177 Ct. Cl. 219, 366 F.2d 1007 (1966), the Court of Claims considered a situation where Food Machinery (taxpayer) had constructed very expensive electric furnaces at the site of a remote and isolated phosphate shale deposit leased by Simplot. Taxpayer did not acquire any ostensible ownership or leasehold interest in the deposit. It did, however, enter into an agreement with Simplot under which Simplot was required to mine the shale, to sell only to taxpayer (and no one else) for 25 years at a price ($1 per ton) which was based on mining costs plus a gross profit of not less than 10 percent and not on the value of the product. The court held that the taxpayer had, as a practical matter, acquired by investment in the furnaces an interest in the mineral in place, despite its lack of any formal mineral owner- ship or leasehold and despite the depreciable character of the furnaces. By the same token, the court also held that Simplot retained no such interest, because after its agreement with taxpayer, it was for all practical purposes merely a contract

miner. Simplot did not share directly in the economic productivity of the minerals and market risks on their sales. Hence, the taxpayer was entitled to the full depletion allowance, and Simplot to none.

In *Paragon Jewel Coal Co. v. Commissioner*, 380 U.S. 624 (1965), the Supreme Court denied a depletion deduction to contract miners who had invested extensively in equipment and development expenses, and who claimed that they had the right (but not the obligation) to mine designated areas to exhaustion. However, the contract miners never acquired ownership of the coal, either in place or after mining. Ownership remained with the lessee, who could sell it at the market price and was obliged to compensate the miners only at a prearranged fixed fee per ton. This price was, however, subject to prospective change at the lessee's will from time to time as costs and coal prices fluctuated. The Court held that the contract miners had "a mere economic advantage derived from production, through a contractual relation to the owner, by one who has no capital investment in the mineral deposits."

The key factor which led to this holding that the contract miners had no economic interest was that "Paragon was bound to pay the posted fee regardless of the condition of the market at the time of the particular delivery and thus the contract miners did not look to the sale of the coal for a return of their investment, but looked solely to Paragon to abide by its convenant." (380 U.S. at 635.) *Commissioner v. Southwest Exploration, Co., supra*, was distinguished because the contract miners, unlike the upland owners in *Southwest Exploration*, provided no indispensable contributions of legal interest which were prerequisite to recovery of the minerals.

In *Victory Sand & Concrete, Inc. v. Commissioner*, 61 T.C. 407 (1974), we held that a taxpayer who mined State-owned sand and gravel in the Kansas River had an economic interest therein despite its lack of any ownership or leasehold interest therein. Taxpayer had an exclusive permit from the State, in which it made no investment, but had an investment in adjacent riparian land used (and essential) in connection with a mining operation. Likewise, in the earlier case of *Oil City Sand & Gravel Co. v. Commissioner*, 32 T.C. 31 (1959), we also held that an adjoining riparian owner could deplete sand and gravel mined under permit in a State-owned streambed. In *Victory Sand*, we held

that an economic interest was established not only on the ground of the contract with the State. Under that contract, the taxpayer had an exclusive right to mine to exhaustion (as long as it was not in breach of the agreement). It is of significance that the taxpayer made no direct investment in the contract itself, other than a 2-cent-per-ton royalty-type payment to the State, with no required minimum production. The only immediate investment appears to have been in the ownership of the riparian land.

We conclude, therefore, that under the cases the *first* branch of the *Palmer v. Bender* formulation is satisfied if the taxpayer has effectively acquired, by whatever form of legal relationship, at least a share in minerals in place, and has made a qualified investment. An investment will qualify if it is either a direct investment in minerals in place, as by an outright purchase or payment of a lease bonus, or is an investment otherwise necessary to render economically productive his share of the minerals, as by incurring a development expense. In either such case, he has made an investment in minerals in place within the meaning of *Palmer v. Bender.*

We must next apply this understanding of the nature of an "economic interest" to the three leases in this case. As to the Munroe agreement, petitioner had the express exclusive right to mine from February 10, 1972, to April 1, 1975, subject to extension by mutual written agreement. As a matter of economic reality, this effectively endowed petitioner with a significant continuing leasehold interest in minerals in place for a period of extended duration. While no "investment" was made directly in the acquisition of this right, as by a lease bonus paid to Munroe, petitioner made very substantial economic investments which were directly associated with the lease and were prerequisite to its practical exploitation. We conclude that during the periods in question, petitioner had, within the meaning of the gloss placed upon the phrase by the cases, "acquired by investment an interest in the minerals in place." Since we have already determined, and respondent does not seriously contest, that he had to look to the income from the extraction of the minerals for a return of his investment, petitioner's share of the production from the Munroe lease (after payment of landowner's royalties) is subject to percentage depletion.

Turning next to the Coe agreement, we find it clear that after June 1, 1972, depletion was not allowable to petitioner. After that date, the Coes could terminate the agreement at will. Petitioner's only right in the event of such termination was a first option to mine if the Coes decided to continue to allow extraction from their land after termination. The record contains no evidence on which we could base a finding that the land had value only as mineral property, nor does petitioner request such a finding. We must conclude that petitioner's rights were subject to immediate termination at Coe's whim after June 1, 1972. Such a fact, we think, is inconsistent with a continued interest in minerals in place. *Holbrook v. Commissioner*, 65 T.C. 415, 419 (1975). See Rev. Rul. 77–341, 1977–2 C.B. 204; Rev. Rul. 77–481, 1977–2 C.B. 205. As we said in *Holbrook*, "there must exist some element of 'ownership' in the mineral deposit 'in place.' " (*Holbrook v. Commissioner, supra.*) We have held that a miner who can be ousted immediately or on nominal notice from a mineral deposit at any time without cause is not really an owner of any economic interest in the deposit. *Mullins v. Commissioner*, 48 T.C. 571 (1967). This point is discussed more fully below in the context of the Newson lease. As to minerals purchased before June 2, 1972, however, we believe that the Coe lease is substantially indistinguishable from Munroe. True, the lease term was shorter (7 months against 3 years), but the term was established against a backdrop of economic reality, and was sufficient to motivate petitioner to make the necessary investment. While the inartfully drafted agreement did not specify exclusivity, this was evidently intended as a practical matter, in view of the petitioner's exclusive ownership of the necessary access and the contractual language ("Lloyd Weaver to have first option to renew contract") phraseology seemingly inconsistent with the notion that more than one simultaneous exploiter of the mineral resources was contemplated. Thus we hold that production under the Coe agreement through June 1, 1972, but not thereafter, was depletable.

The last lease we must consider is the Newson lease. This lease is similar to the Munroe lease except for one possible distinguishing feature. Under Newson, the taxpayer acquired the exclusive right to mine to exhaustion, subject however to the lessor's right to terminate without cause on 120 days' notice. We think the lease clearly provided petitioner an economic interest in the

minerals in place unless the 120-day termination clause is inconsistent with such a conclusion.

The effect upon a putative economic interest of a clause permitting cancellation on no notice or nominal notice has been a matter of considerable controversy. In *Parsons v. Smith*, 359 U.S. 215 (1969), the Supreme Court denied percentage depletion to a contract coal miner. The Court enumerated seven factors which led it to the conclusion that the miner had no economic interest. The third of those factors was the fact that "the contracts were completely terminable without cause on short notice." (359 U.S. at 225.) The notice period there required was only 10 days. As we have observed above, other facts in the case might well have precluded an economic interest even in the absence of short-notice terminability. Thus, the taxpayer held no legal interest as owner or lessee or the economic equivalent in either the coal in place or the coal after severance. It merely received fixed unit prices for the delivery of coal and participated neither in the risks nor the rewards of coal market price fluctuation. The Court did not explain the relative importance of the factor of short-notice terminability in relation to the other factors. Since *Parsons v. Smith*, the courts have not agreed on whether an otherwise qualifying interest can constitute an economic interest in spite of short-notice terminability.

In *Mullins v. Commissioner, supra,* we held that a 60-day termination clause disqualified an otherwise qualifying coal lease from constituting an economic interest. In the same case, a similar lease with a 2-year term was held to qualify during the term, because this "was sufficient time for the lessee-partnership to extract a substantial portion of the coal from that seam." (48 T.C. at 580, citing G.C.M. 26290, 1950–1 C.B. 42, 45.) In a dissenting opinion, Judge Drennen contended that the short-notice terminability was not fatal to the depletion on the canceled lease. Judge Tietjens, also dissenting, would have denied depletion even to noncancellable leases considered in the same opinion. In *Winters Coal Co. v. Commissioner*, 57 T.C. 249 (1971), revd. 496 F.2d 995 (5th Cir. 1974), we followed *Mullins* and held that a clause in coal leases permitting either party to cancel on 60 or 30 days' notice sufficed to deny depletion to the lessee. However, the Court of Appeals reversed us. The writer of the Court of Appeals' opinion determined that short-notice terminability did not disqualify an otherwise depletable lease-

hold interest. The other two judges on the panel did not reach that issue but held the lease to be depletable because of the lessee's surface rights, by analogy to *Commissioner v. Southwest Exploration Co., supra.* In *Whitmer v. Commissioner,* 443 F.2d 170 (3d Cir. 1971), affg. a Memorandum Opinion of this Court, the Court of Appeals for the Third Circuit said in the case of a 30-day terminability provision that the right to mine *until exhaustion* was prerequisite to depletion. This goes farther than our cases, where we have not required a showing that the lessee could mine to exhaustion. See, e.g., *Mullins v. Commissioner, supra,* (2-year term suffices where this permits severance of a "substantial" part of the deposit). See also *McCall v. Commissioner,* 312 F.2d 699 (4th Cir. 1963).

In *Bakertown Coal Co. v. United States,* 202 Ct. Cl. 842, 485 F.2d 633 (1973), the Court of Claims held that short-notice terminability (30 days) did not preclude the existence of an economic interest in an otherwise qualifying coal lease. The court there construed *Parsons v. Smith* as mandating consideration of terminability only in the case of a taxpayer who lacked either a fee or a leasehold interest in minerals in place. This opinion, like that of the writer of the Fifth Circuit's opinion in *Winters Coal Co.,* appears inconsistent with, and does not follow, our holding in *Mullins* and *Winters Coal Co.,* and *Whitmer,* nor the Third Circuit opinion in *Whitmer.* Judge Nichols dissented from the Court of Claims opinion. Respondent will not follow *Bakertown.* Rev. Rul. 77–481, 1977–2 C.B. 205.

The foregoing summary of the case law discloses considerable and continuing disagreement over a lessor's right to terminate on nominal notice. We have held that for this purpose a 30-day or 60-day cancellation clause is fatal. We have not previously had to address a clause such as that in the Newson lease permitting cancellation in 120 days. Clearly, a line must be drawn somewhere between a cancellation clause with notice so short that the lessee's market rights to mineral in place are for all practical purposes illusory, and a clause which leaves the lessee with substantive rights of genuine economic significance. The question is very close, and our record is not helpful in disclosing the economic potential of a guaranteed 120-day mining period. Nevertheless, like other close questions it must be decided, and we are of the view that a 120-day period of notice under the circumstances here was longer than nominal and had sufficient

economic significance to give the petitioner a capital interest in minerals in place, albeit a rather minimal one. Given 120 days' notice, we would expect petitioner to be able to extract rather significant quantities of sand and gravel from the Newson deposit before retiring from the scene. The Coe lease was for merely 7 months. Petitioner testified, and we find, that this period was expected to suffice for the removal of all salable material in that 10-acre site. Moreover, all salable material was in fact removed within that period. Extraction thereafter was limited to very coarse gravel not originally considered marketable. This suggests to us that in the industry in this area (the leases were all near each other) 120 days would have economic significance as a removal period on the 20-acre Newson parcel, and was not mere nominal notice. We are not disposed to abandon our established position on the ineffective nature of a lease with a truly nominal notice period. However, we are admittedly influenced by the sharp division among courts on the issue to avoid significantly expanding the effect of our controversial position by defining a nominal notice period more broadly than we have heretofore had to do. Each case must of course turn on its own facts. If in a given case it were shown that 120 days would be required simply to close down operations and that there would be insignificant production after notice were given, that would no doubt be a different matter. We find here on the particular circumstances of this case merely that a 120-day notice period provides more than nominal notice and is therefore not per se inconsistent with the depletable interest. Accordingly, we find that production under the Newson lease was depletable.

*Decision will be entered under Rule 155.*